**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
|      ) | |
|     Plaintiff,      ) | |
|      ) | |
|    v.      ) | No. 09 CR 69-1 |
|      ) | |
| SUSHIL SHETH,      ) | Judge Rebecca R. Pallmeyer |
|      ) | |
|     Defendant,      ) | |
|      ) | |
|   and      ) | |
|      ) | |
| FIDELITY INVESTMENTS (a/k/a      ) | |
| FIDELITY EMPLOYER SERVICES CO.),      ) | |
| HARTFORD LIFE & ANNUITY INS. CO.,      ) | |
| MORGAN STANLEY SMITH BARNEY,      ) | |
| LINCOLN NATIONAL LIFE INS. CO.,      ) | |
| and THE VANGUARD GROUP,      ) | |
|      ) | |
|   Third-Party Citation Respondents.      ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

From 2002 through 2007, Defendant Sushil Sheth, a cardiologist, submitted fraudulent bills to Medicare and other insurance company victims for medical services Sheth had never provided. In August 2009, Sheth pleaded guilty to a single count of health care fraud. The court sentenced Sheth to 60 months in custody and ordered him to pay $12,376,310.47 in restitution to the victims. The court also entered an *in personam* forfeiture order that imposed judgment against Sheth in the amount of $13,000,000, and identified certain specific property to be forfeited. Sheth's plea agreement required that "any payments made in satisfaction of the forfeiture judgment shall be credited to any outstanding restitution judgment."

Over the next several years, the government collected and liquidated more than $10 million in assets to satisfy the criminal judgments against Sheth. In September 2012, the government moved for turnover of some $300,000 held in Sheth's retirement and life insurance accounts. Sheth resisted the motion, arguing that the government had collected assets

sufficient to satisfy his restitution obligation and was not permitted to collect the retirement accounts. This court observed that Sheth's indebtedness (including a related civil judgment owed to the government) vastly exceeded the amounts the government had received, and granted the government's motion.

Sheth appealed, and the Seventh Circuit vacated the turnover order. The Court of Appeals noted that the retirement accounts are protected by the anti-alienation provisions of the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1056(d), and can be collected only if there is a deficiency on the criminal restitution judgment, 18 U.S.C. § 3613(a). The Court of Appeals remanded for discovery and an evidentiary hearing on Sheth's claim that the restitution judgment has been satisfied by the amounts already forfeited. *United States v. Sheth*, 759 F.3d 711, 717–18 (7th Cir. 2014). Following discovery, the government renewed its motion for a turnover order for the proceeds of the retirement accounts. As explained below, the motion is granted.

## BACKGROUND

Sushil Sheth pleaded guilty in August 2009 to an information charging him with health care fraud in violation of 18 U.S.C. § 1347. (Plea Agrmnt. [35], at 1.) Sheth billed Medicare and private insurers for approximately $13,000,000 in fraudulent charges between January 2002 and December 2007. (*Id.* at 3–5.) As part of the plea agreement, Sheth forfeited his interest in numerous assets, including real estate and personal property, which were proceeds of the crime. (*Id.* at 12–13.) The government agreed that amounts collected by forfeiture would be credited against his restitution obligation:

> 17. Defendant further understands that while forfeiture of property is not typically treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose, it is agreed by the parties that any payments made in satisfaction of the forfeiture judgment shall be credited to any outstanding restitution judgment.

(*Id.* at 15.)

2

As noted, the court sentenced Sheth to 60 months in prison, ordered him to pay restitution in the amount of $12,376,310.47, and entered a forfeiture judgment and order forfeiting assets identified in the parties' agreement. (J. Order, Aug. 10, 2010 [84]; Prelim. Order of Forfeiture [66], at 5.)[1] In addition to this judgment, the United States also has a civil judgment in a False Claims Act case arising from the same conduct; Sheth owes $20,000,000 as a result of that judgment. *United States ex rel. Lokesh Chandra v. Sushil Sheth*, No. 06 C 2191, Consent J. & Settlement Agrmnt. [37], at 3 (N.D. Ill. Sept. 28, 2010).

## I. Government Collection Efforts

After the forfeiture order was entered in August 2010, the government collected and attempted to liquidate all of the assets identified in the forfeiture orders. First, the government collected funds held in various accounts for which seizure orders were entered prior to the filing of the criminal case. In June 2007, Magistrate Judge Keys entered several seizure warrants freezing four Harris Bank accounts (Decl. of Dorothy Cuadra, attached to Mem. of United States in Supp. of Mot. to Ratify Turnover Orders [260], at ¶ 3); on September 11, 2007, Harris Bank released $6,513,229.58 to the government, which the United States Marshal Service (USMS) held in escrow pending further proceedings. (*Id.* at ¶¶ 11–13.) Next, the government received an additional $1,043,862.85 from other cash accounts at First Bank, Oppenheimer Funds, and Bright Start in September 2010 and June 2011 and deposited them with the USMS. (*Id.* at ¶ 15.) Though Judge Castillo had entered a temporary restraining order freezing these funds in February 2008 (*id.* at ¶ 4), the government did not move to collect them from the institutions until after the preliminary order of forfeiture was entered more than two years later. (*See* Return of Prelim. Order of Forfeiture as to First Bank, Sept. 17, 2010 [82]; *see, e.g.*, Third Party Citations to Discover Assets as to Fidelity Service Co., Apr. 18, 2011 [107]). All of the funds were held by the USMS until July 2013, when they were turned over to the Clerk of the Court for

---

[1]      The order was amended approximately a year later to reflect that certain of the assets forfeited were investments, not cash. (Am. Prelim. Order of Forfeiture [132], at 7.)

dispersal to the non-federal victims, and to the Department of Justice Debt Accounting and Operations Group for dispersal to the government victims. (Mot. for Order Directing U.S. Marshals Service to Release Funds [199], at 6; Order, Jul. 18, 2013 [201].)

In addition to funds in these accounts, Sheth had investment assets, including several accounts with Advanced Equity Investments (AEI). (Aff. of Byron Crowe, attached to Mem. of United States in Supp. of Mot. to Ratify Turnover Orders [260], at 1.) Each AEI account consists of a membership interest in a limited liability company in the information and green technology field. (Crowe Aff. 2.) In response to the forfeiture order, AEI successfully liquidated five of the eight accounts for a total of $2,524,777.84 and turned the funds over to the government. (*See* Cuadra Decl. ¶ 17.) Two of the accounts could not be liquidated, the government contends, because they were unregistered securities that would be "complex and costly" to liquidate. (Mem. of United States in Supp. of Mot. to Ratify Turnover Orders [hereinafter Gov't Br.] [260], at 9; Crowe Aff. 4.) One account, the Altra Investments II vehicle in which Sheth had invested $250,000, was a complete loss. (Crowe Aff. 3–4.) According to Byron Crowe, the administrator of the AEI investments between 2006 and 2014 (*id.* at 1), Altra Biofuels, Inc., the company in which the account was invested, spun off a technology (presumably the only technology or the only valuable one) to a new company. (*Id.* at 3.) Altra issued a capital call, which Sheth did not meet, resulting in Sheth's having no interest in the new company. (*Id.* at 4.) Neither Crowe nor the parties say exactly when these two events occurred, though Sheth implies that it was after the forfeiture orders were entered and he was accordingly powerless to take action. (Sheth Br. 5.) In 2013, Altra's board of directors deemed Altra worthless. (Crowe Aff. 4.) Crowe does not provide more information about why Altra was deemed worthless by its Board, but Sheth does not contest the current value of the account in his response brief.

The government also liquidated two undeveloped lots in Arizona, one located at 9121 East Andora Hills Drive, Scottsdale, Arizona and another at 40121 East 107th Street,

Scottsdale, Arizona. (Cuadra Decl. ¶ 19.) Sheth purchased the properties in 2006 for a combined $710,000.[2] (*Id.*) According to the government, the value of the two properties declined precipitously; they were appraised in July 2007 at $690,000, but three years later were appraised again at just $197,000. (*Id.* at ¶ 20.) On June 22, 2011, the court granted the government's motion for interlocutory sale of the properties to preserve the availability of equity in the property. (Order Directing Interlocutory Sale of Certain Property, Jun. 22, 2011 [136], at ¶ (j).) The properties sold for just $77,000, and after paying off unpaid property taxes and closing costs, the government reports that it netted only $35,237.57 on the sale. (Cuadra Decl. ¶¶ 21–25.)

The government credited other miscellaneous amounts to Sheth's restitution judgment as well. First, the government reduced Sheth's judgment by $231,921 owed to him; the government cannot identify the source of this account payable, but suspects it is a Medicare provider reimbursement. (Gov't Br. 10.) Unsurprisingly, Sheth does not object to the credit. Second, the Bureau of Prisons withheld $25 per quarter from Sheth's prison wages as part of its Inmate Financial Responsibility Program, netting Sheth a $300 credit. (*Id.*; Reply by United States in Supp. of Mot. to Ratify Turnover Orders [hereinafter Gov't Reply Br.] [270], at 17 (conceding Sheth was due a total of $300).) Finally, Sheth's former wife, Anita Sheth, sold the home that he owned with her in Flossmoor, for which Sheth was credited half of the net proceeds in the amount of $108,181.42. (Decl. of Christopher Burton, attached to Gov't Br [260], at ¶ 6.)

## II.    Assets Relinquished to Anita Sheth

Sheth claims he is entitled to credit for several assets that were the subject of the forfeiture order, but which the government ultimately relinquished to Anita Sheth. In September 2010, just one month after the entry of the preliminary order of forfeiture, Ms. Sheth and her two

---

[2]    The record does not disclose whether this was a single transaction or the same seller, but the parties do not dispute the total purchase price of the properties.

children filed a petition asserting a claim to substantially all of the property in the forfeiture order. (Pet. of Anita Sheth et al. [70].) This petition was served only on the United States Attorney, the Pretrial Services Office, and the U.S. Probation Department. (*Id.* at "Certificate of Service.") Ms. Sheth moved for adjudication of her rights in the property, serving that motion on the same offices. (Notice of Mot. of Claimants, Nov. 16, 2010 [88], at 2.) Ms. Sheth's attorneys presented the motion in court on November 29, 2010. (Minute Order [94].) On June 21, 2011, the government filed a motion proposing an order to settle Anita's claims, but there is no evidence that this motion, either, was served on Sheth. (Mot. for Order Dismissing the Claims of Anita, Serena & Rishi Sheth [129]; Notice of Mot. [130].) The court granted the motion, adopting the parties' proposed order on June 22, 2011 [134]. Sheth contends that he did not receive notice of Anita's claims or the proposed settlement. (Def.'s Resp. to Mot. for Issuance of Judicial Deed [225], at 2, 8.)[3]

The settlement relinquished just four assets to Ms. Sheth. First, Sheth was co-owner of an investment account held at Harris Bank containing assets worth $760,944 (this is a different account than the four Harris cash accounts discussed above). (Gov't Reply Br. 8–9.) At the time Sheth agreed to the forfeiture of that account, the government believed, based on a 2007 bank statement, that the account contained $1,002,544. (*Id.* at 9 n.5, *see also* Resp. by Sushil Sheth Regarding Mot. to Ratify Turnover Orders [hereinafter Sheth Br.] [266], at 4.) By the time the forfeiture order was executed in 2010, however, the account contained only $760,944— according to the government, a function of the 2008 market crash. (Gov't Reply Br. 9 n.5.) In its brief, the government explains that it relinquished its interest in the Harris account to Anita

---

[3]     It is not clear if Sheth had counsel during this period. Sheth's attorneys that represented him before sentencing had been terminated from this matter as of the court's judgment in August 2010. (J. Order, Aug. 10, 2010 [84].) Sheth retained attorneys from Johnson Legal Group in July 2011 (a month *after* the settlement with Anita was entered) to research whether any of his assets might be exempt from forfeiture. (Johnson Mot. to Withdraw, Oct. 11, 2012 [147].) Sheth claims that he received no notice of the motion to settle Anita's claims, and did not attend the hearing. (Def.'s Resp. to Mot. for Issuance of Judicial Deed [225], at 2, 8.) Sheth points out that neither Anita's motions nor the government's motions bear certificates of service to show they were sent to him. (*Id.* at 2.)

because it had no basis to rebut her claim that she or her family were the source of all of the funds in the account, and that Sheth's name had been added to the account only for estate-planning purposes in the event she predeceased him. (*Id.* at 9.)

Second, Sheth owned two properties in joint tenancy with Anita located in Burr Ridge, Illinois at 8691 Crown Court and 850 Village Center Drive. (Pet. of Anita Sheth 9.) The government conducted appraisals of both properties in July 2010. (U.S. Marshals Serv., Real Property Net Equity Worksheets, attached as Ex. C and Ex. D to Gov't Reply Br.) The government found that the Crown Court property was worth $1,086,000, substantially exceeded by the $1,559,500 mortgage on the property. (*See id.* at Ex. C.) The Village Center Drive similarly was appraised at $345,000, but was encumbered by a $417,000 mortgage. (*See id.* at Ex. D.) Sheth also forfeited a vehicle, a 2002 BMW X5. The government's position as to these assets is that there was no recoverable value: the Burr Ridge properties had no equity because the mortgages exceeded the assessed value, and the vehicle "was worth not much more than it would cost to sell it." (Gov't Reply Br. 16.)

### III.    Sheth's ERISA-protected Accounts

In September 2012, the government filed a motion requesting that the court issue a turnover order for five retirement and life insurance accounts worth a total of $300,738.61, accounts otherwise exempt from collection under ERISA. (Consolidated Mot. for Turnover Orders [143], at 2.) Sheth resisted the government's motion, asserting that he had forfeited sufficient assets to satisfy the restitution order and that the government had refused to provide an accounting of its activities in liquidating his assets. (Resp. to Consolidated Mot. for Turnover Orders [160].)

The court granted the government's motion for a turnover order. The court reasoned that the retirement funds were subject to recovery because even if the restitution amount had been met in the criminal case, Sheth would still owe $20 million on the civil judgment. The Seventh Circuit vacated and remanded that ruling, noting that retirement accounts are protected

by the anti-alienation provisions of ERISA, and may be collected only under the authority of the Mandatory Victims Restitution Act, 18 U.S.C. § 3613, which supersedes the anti-alienation provisions. *United States v. Sheth*, 759 F.3d 711, 716, 718 (7th Cir. 2014) (citing 29 U.S.C. § 1056(d)). Though Sheth has a $20 million civil judgment against him, certain assets—such as the retirement accounts that are the subject of these turnover orders—are not subject to collection to satisfy a civil judgment, and may only be collected to satisfy an outstanding restitution balance. *Id.* at 716. Therefore, if the assets that Sheth has already forfeited are sufficient to satisfy the restitution judgment, the government cannot collect the retirement accounts. *Id.* The Seventh Circuit remanded for discovery and a hearing on whether the restitution judgment has been satisfied. *Id.* at 718.

On remand, the government promptly renewed its motion for turnover. (Mot. to Ratify Turnover Orders [259].) The government has responded to Sheth's discovery requests (Gov't Reply 2 n.1), and contends that $10,709,309.07 has been paid against the $12,376,310.47 restitution judgment. (Decl. of Christopher Burton, attached to Gov't Br. [260], at Table A). The government claims interest at a rate of .25% since August 25, 2010 (shortly after the court entered judgment on August 10, 2010) on a portion of the judgment amount. (*Id.*) The government credited Sheth with the value of the assets already in escrow on the date of the judgment—the $6.5 million from four Harris accounts turned over in 2007—and claims a right to interest only on the balance. (*See id.*) Adding $32,940.53 in accrued interest, the government contends that Sheth owes an outstanding balance of $1,699.941.93 (*id.*), which would remain unsatisfied even if the full value of the retirement accounts (approximately $300,000) is turned over. Sheth raises several arguments in support of the contention that he has already satisfied the restitution judgment. The court's disposition follows.

## DISCUSSION

On remand, Sheth renews several arguments as to why the restitution judgment has already been satisfied. First, Sheth contends that he should be credited with interest on the

funds seized during the time that they were held by the U.S. Marshal before being disbursed to the victims, from 2007 to 2013. Second, Sheth argues that he should get credit for the value of the various assets at the time of the forfeiture, making any intervening loss in value at the time of liquidation or whether the assets were relinquished to Anita irrelevant for the purposes of calculating the deficiency on the restitution judgment.

Both arguments assume that the government owes Sheth some duty, as a result of the plea agreement, in how it handles property that has been forfeited and how it credits Sheth. Plea agreements are generally treated in accord with traditional contract principles, "while being mindful of the defendant's due process right to fundamental fairness in the criminal proceeding that produced the agreement." *United States v. Brown*, 779 F.3d 486, 492 (7th Cir. 2015). The court interprets plea agreements objectively, relying on the plain meaning of the terms to determine the parties' intent. *Id.* Courts construe ambiguities against the drafter (here, the government). *United States v. Munoz*, 718 F.3d 726, 729 (7th Cir. 2013). The court will not, however, read terms into the agreement to which the parties have not actually agreed. *Brown*, 779 F.3d at 492. Implied in every contract, including in plea agreements, is "the general duty of good faith and fair dealing." *United States v. Wilson*, 390 F.3d 1003, 1012 (7th Cir. 2004). The scope of this duty with regard to plea agreements is not defined in this Circuit, nor is the law of other Circuits particularly informative,[4] though the Restatement, cited favorably in *Wilson*, *id.*, comments: "[B]ad faith may be overt or may consist of inaction . . . . [T]he following types are among those which have been recognized in judicial decisions: evasion of the spirit of the

---

[4] Most cases in the Seventh Circuit on this issue concern whether the government has fairly refused to advocate a sentencing reduction for substantial assistance, *United States v. Sakellarion*, 649 F.3d 634, 639–40 (7th Cir. 2011) (collecting cases), and do not further elaborate on the good faith rule. Similarly, most outside authority considering the government's obligations under plea agreements deal with the government's alleged failure to sufficiently advocate for a promised sentencing reduction or the government's advocating an upward adjustment in violation of the agreement. *See, e.g., United States v. Palladino*, 347 F.3d 29, 33–35 (2d Cir. 2003); *United States v. Welch*, 638 Fed. App'x 674, 679 (10th Cir. 2015); *United States v. Cook*, 607 Fed. App'x 497, 505–06 (6th Cir. 2015).

bargain, lack of diligence . . . ."  Restatement (Second) of Contracts § 205 cmt. (d) (Am. Law Inst. 1981).

The government has broad discretion in how it collects criminal restitution judgments. "Federal law allows the government to collect financial obligations under criminal judgments by using federal and state procedures for collecting civil judgments."  *United States v. Resnick*, 594 F.3d 562, 565 (7th Cir. 2010); 18 U.S.C. § 3613(f) ("[A]ll provisions of this section are available to the United States for the enforcement of an order of restitution); *id.* at § 3613(a) ("The United States may enforce a judgment imposing a fine in accordance with the practices and procedures for the enforcement of a civil judgment under Federal law or State law.").  Though it appears within Title 21, which addresses drug offenses, 21 U.S.C. § 853 prescribes the procedures for this criminal forfeiture.  18 U.S.C. § 982(b)(1) ("The forfeiture of property under this section, including any seizure and disposition of the property and any related judicial or administrative proceeding, shall be governed by the provisions of section 413 (other than subsection (d) of that section) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853)."); *see also* 28 U.S.C. § 2461(c) ("The procedures in section 413 of the Controlled Substances Act (21 U.S.C. 853) apply to all stages of a criminal forfeiture proceeding . . . .").  The statute makes clear that the Attorney General has authority to dispose of such property in accord with civil forfeiture provisions.  21 U.S.C. § 853(i)(4).  Relevant to this proceeding, the Attorney General is authorized to "grant petitions for mitigation or remission of forfeiture, restore forfeited property to victims of a violation of this subchapter, or take any other action to protect the rights of innocent persons which is in the interest of justice and which is not inconsistent with the provisions of this section," 21 U.S.C. § 853(i)(1), and directed to "mak[e] due provision for the rights of any innocent persons" when disposing of forfeited property, *id.* § 853(h); *see also id.* § 853(i)(4).

The government argued, and Sheth did not contest, that Sheth has raised the affirmative defense of payment in this proceeding, upon which he bears the burden of proof. FED. R. CIV. P. 8(c)(1).[5]

## I.    Interest

The United States Marshal Service held the proceeds of the Harris accounts, $6,513,229.58, from 2007 to 2013 without crediting Sheth with interest on the seized funds. (Sheth Br. 1; Burton Decl. ¶ 13.)  Sheth complains that the Harris funds are being treated differently than the contents of the other cash accounts at First Bank, Oppenheimer, and Bright Start which remained in their interest-bearing accounts until 2010, and for which the government credited him with the interest earned while the funds remained in those accounts. (Sheth Br. 2–3.)  He further argues that even as to the proceeds from these interest-bearing accounts, he should be credited with interest for the time the Marshals held the funds until they were dispersed to the victims in 2013. (Sheth Br. 3.)

The court is uncertain why the United States Marshal Service would forego interest on funds within its possession.  It is undisputed, however, that once the government had taken possession of the Harris Bank funds, Sheth was entitled to a credit of that amount against his indebtedness.  In other words, Sheth does not owe interest on those amounts merely because the government chose not to liquidate them.  The government credited Sheth with the Harris Bank funds already in its possession before it began claiming interest on the judgment, entered

---

[5]    The restitution statute itself tasks the court with determining which party bears the burden of proof as to "other matters" not laid out in the statute, 18 U.S.C. § 3664(e), and this unusual situation is not addressed.  The government may not withhold information on payments made against the restitution, *United States v. Dawson*, 250 F.3d 1048, 1050–51 (7th Cir. 2001), and has not done so here.  The court has not located, nor has either party cited, authority more specifically addressing the burden of proof issue, and the court accordingly defaults to the ordinary understanding, not contested here, that payment of the judgment is an affirmative defense. *See, e.g., Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 235 (7th Cir. 1991).

in August 2010 (*see* Burton Decl. at Table A), consistent with this principle.[6]  The government appropriately credited Sheth with the interest from the First Bank, Oppenheimer and Bright Start accounts on the dates that those funds were received by the Marshal in September 2010 and June 2011.  (*Id.*)

That said, the court agrees with the government that Sheth has no right under the plea agreement or any applicable law to earn interest on his ill-gotten gains once the government seized them.  There is no provision in the plea agreement for paying Sheth post-seizure interest.  (*See* Plea Agrmnt. [35].)  The agreement makes clear where it diverges from the norm: forfeitures are not typically credited against restitution judgments at all, but the government agreed that they would be in this case.  (*Id.* at 15.)  The agreement does not further create an extraordinary right to collect interest on payments on a judgment.  (*See id.*)

As Sheth sees things, "the language of the plea agreement is plain and clear, any 'payment' whether it be 'payment' of interest, or 'payment' of principal is 'payment' that should be credited to any outstanding restitution judgment."  (Sheth Br. 2.)  The court believes that is exactly what was done here.  Sheth's liability for the amounts in the cash accounts seized by the government (the Harris Bank, First Bank, Oppenheimer and Bright Start accounts) was extinguished once the funds were turned over to the government.  And the government credited Sheth with the interest *in fact earned* on the Oppenheimer, Bright Start and First Bank accounts between 2007 and 2010 before they were actually turned over to the Marshals.

The word "payment," in the context of the agreement, means the liquidated value of the

---

[6]     Sheth previously made the argument that it is inequitable to charge interest on the restitution judgment while failing to apply the value of the seized assets to the principal.  *See United States v. Sheth*, 759 F.3d 711, 714 (7th Cir. 2014).  Sheth did not raise this concern in his response brief, and the court presumes that the government's explanation of the date on which it credited Sheth with the seized assets, and when it claims interest began to accrue, has adequately addressed Sheth's concerns.  Regardless, those arguments are now waived.

asset at the time that the Marshals actually applied that value to the judgment.[7]   This interpretation is consistent with existing norms of debt payment:  a judgment can be satisfied, or partially satisfied, in cash, in which case the debtor has no right to receive interest on funds after they are paid.  If a judgment is paid by forfeiture of physical assets, such as real property, the amount credited against the judgment is the liquidated value of the asset after it is sold.  *See, e.g., Mortgage Elec. Registration Sys. v. Estrella*, 390 F.3d 522, 523 (7th Cir. 2004) (sale price of home applied to judgment on mortgage default).   The court sees nothing in the plain language of the agreement to diverge from this norm.

## II.     Assets relinquished to Anita

The government argues that Sheth has no claim to credit for assets relinquished to Anita.   The court ultimately agrees that is true in this case, but does not endorse the government's assumption that it has unrestricted authority to relinquish forfeited assets to third parties.  (*See* Gov't Reply Br. 9–10.)  The government asks "why should Sheth receive credit against his restitution judgments (meant to make his victims whole) for money neither the United States nor his other victims ultimately received?"  (*Id.* at 10.)  This ignores the question of *why* the United States and the victims did not ultimately receive these payments, which is that the government itself chose to relinquish them in a settlement agreement.   The government's duty of fair dealing to Sheth at least prohibits it from acting in bad faith in determining what assets to relinquish to third parties.

Sheth's argument on this issue also goes too far.  He contends he is entitled to credit for the value of the forfeited asset at the time the asset is turned over, regardless of whether that value is ever collected or paid to the victims.  (Sheth Br. 4–5.)  In the case of the Harris Bank investment account, he argues that he should receive credit for the $760,944.89 that was

_____

[7]     The court suspects that this issue would have been more easily laid to rest if the plea agreement had not introduced the confounding concept of "paying" a forfeited asset.  A forfeited asset is not paid, it is forfeited.  The value of the asset once it is *liquidated* can be paid against a judgment, but forfeiting the asset is not itself a payment on the judgment.

recovered by the Marshals even though the account was ultimately relinquished to Anita. (*Id.*) The term of the plea agreement that gives credit to Sheth for payments assumes that the property was properly forfeited in the first place. If the government had not settled Anita's claim and she had prevailed on her petition that the assets were not subject to forfeiture, there is no plausible interpretation of "payment" that would require the government to give Sheth credit for an asset legally owed to a third party.

The government is responsible under the plea agreement to act in good faith. It is troubling, therefore, that Sheth himself was not notified of the government's decision to settle Anita's claims (Def.'s Resp. to Mot. for Issuance of Judicial Deed [225], at 2, 8), where that settlement could and did substantially affect the remaining amount of restitution. Nevertheless, Sheth did not raise the issue of notice in response to the government's motion, despite knowledge of this defect, and it is waived. *Cf. Berg v. New York Life Ins. Co.*, 831 F.3d 426, 428 (7th Cir. 2016) (failure to raise notice argument in response to motion constitutes waiver). Sheth has the opportunity to challenge the bona fides of certain of Anita's claims to this property in supplemental briefing, as detailed below.

The court further finds that the government did not act in bad faith. First, Anita took the position that Sheth had never contributed to the Harris Bank investment fund, and his name on the title was purely for estate-planning reasons. (Pet. of Anita Sheth at 9–10; Gov't Reply 9.) The government, after discovery, had no basis to contest that position, and Sheth has not suggested that he has any basis to do so now. (Gov't Br. 9–10.) It appears, therefore, that Anita was an innocent owner of funds that were not proceeds of the fraud. The government's decision to settle that claim by relinquishing the account to her is consistent both with its duty to "protect innocent persons" in determining forfeitures, 21 U.S.C. § 853(i)(1), and the likelihood that Anita would prevail as a superior holder of the interest in the accounts, 21 U.S.C. § 853(n)(6)(a). Sheth has not contested that the ownership of this fund was settled unreasonably—or at least in a way that establishes bad faith—nor does he suggest a basis for

such a challenge. Accordingly, Sheth will not be credited with any portion of the fund relinquished to Anita.[8]

Sheth also protests that he was credited with no value from the Burr Ridge properties relinquished to Anita. (Sheth Br. 8–9.) As he points out, the court ordered that he "was entitled to credit, against his restitution obligation, for his share of the combined equity in the propert[ies]." (Order, Apr. 8, 2014 [228].) In the case of the Burr Ridge properties, the government determined that these assets would have no value upon liquidation because they were underwater on the mortgages. The Crown Court property was appraised at $1,086,000, but was encumbered by $1,559,500 in mortgage debt. (Gov't Reply Br. 15.) The Village Center property was appraised at $345,000 with a mortgage indebtedness of $417,000. (*Id.*) Because there was no equity for the government to redeem, the government relinquished the properties to Anita. (*Id.* at 15–16.)

Sheth received discovery, and presumably was or could have been aware of the value of these properties and the size of the liens. Technically, however he did not have the opportunity to respond to the government's explanation of its decision to abandon the properties, as that explanation did not appear until the government's reply brief. (Gov't Reply Br. 15.) Instead, Sheth argued in his response that he was entitled to the appraised value at the time of the forfeiture. (Sheth Br. 8–9.) The court has already rejected the proposition that Sheth should be credited with the value of an asset before it is liquidated, but will allow him leave to file supplemental materials if he can establish a dispute concerning the value of the properties or the indebtedness, sufficient to suggest bad faith on the part of the government.

---

[8]     Sheth also contends that he was entitled to credit for the $1,002,544 that was the presumed value of the account at the time the forfeiture order was entered, not the $760,944 that was actually collected. The court need not rule on this argument because Sheth is not entitled to any credit from the account, but the court notes that the government has effectively explained the loss in value as a function of market decline between 2007 and the time that it was seized and liquidated in 2010. (Gov't Reply Br. 9 n.5.)

Finally, Sheth argues that he should have received credit on the automobile that the government relinquished to Anita. (Sheth Br. 9–10.) Though he is not entitled to the full value of the vehicle at the time it was relinquished, Sheth would have been entitled to half of the net proceeds, had the vehicle been seized by the Marshals and sold. Accordingly, the court requests supplemental briefing on the Bluebook value of the vehicle, of which the court will take judicial notice if the parties can agree, and the estimated cost of marketing and selling the vehicle. The court will order that Sheth be credited with half the net value.

## III.    Flossmoor property

Sheth received credit for half of the net sale proceeds of the Flossmoor property in the amount of $108,181.42. He asserts, however, that the sale price was "in excess of $260,000.00" and that Anita and the closing attorney received fees. (Sheth Br. 7.) Concerning the fees, Sheth is correct; the final closing statement, which the government asserts it did not receive until after Sheth filed his response to this motion, shows that the attorney received $3,500 in closing costs and that Anita received $12,900 to reimburse her for costs "associated with the Flossmoor property between the parties' June 2011 stipulation and the October 2013 closing." (Gov't Reply Br. 14.) The government also concedes that Sheth should have received half of any rental income (*id.*), but notes that the tenant defaulted and caused damage to the property, so no income was produced. (*Id.* at 14 n.7.) The government is entitled, of course, to use "income accruing to or derived from property ordered forfeited . . . to offset ordinary and necessary expenses to the property which are required by law, or which are necessary to protect the interests of the United States or third parties." 21 U.S.C. § 853(g). Sheth is entitled to examine whether the expenses were "ordinary and necessary," however, and is entitled to conduct discovery concerning recoverable rental income and Anita's claim for $12,900 in costs. The court holds at this time only that he is entitled to half of the net proceeds from the sale, minus half of the reasonable closing fee and reasonable costs associated with the maintenance of the property by Anita. If he can produce sufficient evidence to demonstrate that the

government acted in bad faith by deducting those costs from his credit, he is directed to include it in his supplemental brief.

## IV. Arizona parcels

Sheth is understandably disappointed by the meager recovery on his properties in Arizona; he purchased those properties for $710,000, but the government recovered just $35,237.57 for their sale.  (Cuadra Decl. ¶ 25.)  The law entitles Sheth to credit only from the net proceeds from the sale, however—not, as he argues, the properties' value at some earlier point in time.  (Sheth Br. 6–7.)  Sheth received discovery responses on this, as well, including detailed information on the appraisal history, the offers made on the properties, and the property maintenance fees and closing costs.  (Cuadra Decl. ¶¶ 19–25.)  Sheth argues that he should have been allowed to sell the properties before the market declined (Sheth Br. 6), though he never requested the right to do so.

The government contends Sheth lacks standing to dispute the liquidation of the properties after they were forfeited, citing *Young v. United States*, where the Seventh Circuit upheld the district court's determination that it lacked jurisdiction over a criminal defendant's post-conviction challenge to property forfeiture.  489 F.3d 313, 315–16 (7th Cir. 2007).  The holding of *Young*, however, is that "a criminal forfeiture is part of the defendant's sentence and must be challenged on direct appeal or not at all."  *Id.* at 315.  Here, Sheth does not challenge the forfeiture order, but argues that the government's disposition of the forfeited assets does not comport with its obligations to him under the plea agreement.

The government suggests, further, that *any* value it successfully recovers is fair, so long as the Marshal complied with proper procedures in conducting the sale.  Again, however, the case law it cites, *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994), does not appear to make such a comprehensive statement.  In *BFP*, the Supreme Court considered the amount of consideration necessary to meet the requirement in the Bankruptcy Code that any transfers of property by insolvent debtors within a year of their declaring bankruptcy be for "reasonably

equivalent value" of the property transferred.  *Id.* at 533.  The Ninth Circuit held that as long as a sale complied with state procedures and was not collusive, the court would not further inquire into whether the property was transferred for appropriate value.  *Id.* at 534.  The Supreme Court upheld that ruling, finding that the fair market value of the property is not a relevant consideration in a foreclosure-sale context:

> An appraiser's reconstruction of "fair market value" could show what similar property would be worth if it did not have to be sold within the time and manner strictures of state-prescribed foreclosure.  But property that *must* be sold within those strictures is simply *worth less.*  No one would pay as much to own such property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques.

*Id.* at 539 (emphasis in original).  The Court went on to observe that the Bankruptcy Code does not authorize establishment of a federal standard for a reasonable foreclosure price; such a standard would cross many jurisdictions with many different requirements for foreclosure sales. *Id.* at 540.  Instead, the Court concluded, any price received is a "reasonably equivalent value" as long as the sale complied with state procedures.  *Id.* at 545.

The strictures of the foreclosure context that drove the Court's reasoning in *BFP* may not be relevant here.  The Attorney General need only "direct the disposition of the [forfeited] property by sale or any other commercially feasible means, making due provision for the rights of any innocent persons."  21 U.S.C. § 853(h).  No judicial confirmation of the sale is required, *cf.* 735 ILCS 5/15-1508, nor is there any provision for a redemption proceeding, *cf.* 735 ILCS 5/15-1604, that might drive away market-rate buyers.  Instead, the order of sale in this case simply directed the Marshals to sell the properties through a "real estate broker experienced and knowledgeable in the sale of similar property, with multiple listing capabilities, who shall be paid the usual and customary commissions and/or fees . . . ."  (Order for Interlocutory Sale, Jun. 22, 2011 [136], at 5.)  The government proposes that the "Marshals Service is not in the business of owning real estate, so its sale of the Arizona properties . . . must be regarded as a forced sale." (Gov't Reply Br. 12.)  The court doubts that the Marshals Service is not equipped to hold and

subsequently liquidate real estate pursuant to forfeitures, as it presumably does so everywhere forfeiture of real property occurs, and retains contractors and systems for the purpose. *See, e.g.*, United States Marshals Service, *National Sellers List*, https://www.usmarshals. gov/assets/nsl.htm (last visited January 4, 2017).[9]

The government does, then, have a duty of good faith in connection with the sale procedures, but the court concludes that the timing of the sale of the properties does not reflect a violation of that duty. The government did not obtain an order of forfeiture for the property until August 2010. (Preliminary Order of Forfeiture, Aug. 10, 2010 [66].) Anita filed a claim to the parcels on September 8, 2010. (Pet. of Anita Sheth.) The government negotiated a settlement of that claim, and promptly filed its motion for interlocutory sale of the properties on June 20, 2011 [127], the day before it moved to dismiss Anita's claims in light of the settlement [129]. Both motions were granted two days later on June 22, 2011 [134]; [136]. The government has not identified the date on which the Marshals Service approved a marketing plan (*see* Cuadra Decl. ¶ 21), but there were offers on the table for both properties by August 30, 2011. (Cuadra Decl. ¶¶ 22–23.)

The government could not have produced a clear title to a buyer before Anita's petition was resolved. 21 U.S.C. § 853(n)(7). It may have been possible for the government to seek leave to conduct an interlocutory sale under 21 U.S.C. § 853(e), but it is reasonable to conclude that such a cloud on the title would itself have undermined the value of the properties. Moreover, the duty of fair dealing does not require the government to take extraordinary measures to protect the equity in the properties without a motion from the defendant to sell the assets. *Cf. United States v. Approximately 81,454 Cans of Baby Formula*, 560 F.3d 638, 641

---

[9]    The website attests to the Marshals' abilities to handle forfeited assets: "The U.S. Marshals Service (USMS) offers property for sale to the public which has been forfeited under laws enforced or administered by the United States Department of Justice, its investigative agencies (Drug Enforcement Administration, Federal Bureau of Investigation, and Bureau of Alcohol, Tobacco and Firearms), and certain other federal law enforcement agencies. More than 9,000 items of forfeited property are sold annually with gross sales in excess of $99 million."

(7th Cir. 2009) (defendant's failure to move for expedited hearing limited its right to contest government delay in selling asset subject to forfeiture). Finally, Sheth sought and received information concerning the government's sale of the parcels, as well as the detailed description of the sale process in the government's brief, and has not asserted any impropriety other than delay. (Sheth Br. 6–7.) The court concludes that the delay did not deprive Sheth the benefit of his plea in light of the government's inability to convey a clear title before the third-party interests were adjudicated. 21 U.S.C. § 853(n). Accordingly, Sheth need not be granted any further credit on the Arizona parcels.

V.      **Altra Investments**

Finally, Sheth contends that he is entitled to a credit for the Altra Investments II account, purchased for $250,000, that now—according to the board of the company in which the account was invested—is worth nothing. (Crowe Aff. 3–4.) As with the various other assets, Sheth requests a credit in the value of the account at the time it was forfeited, not its liquidated value. (Sheth Br. 5.) For reasons explained above, there is no basis in the plea agreement, or in other standards for recovery of assets, that support this request. He raises the possibility, however, that the loss in value could have been averted if he still had control of the assets. (Sheth Br. 5 ("Dr. Sheth had no obligation to and did not have the right to meet the capital call.").) Unlike the Arizona parcels, the briefs do not disclose more information regarding the government's stewardship of these assets. If Sheth can produce evidence that the government acted in bad faith by failing to manage the account properly, he is directed to include it in his supplemental brief.

There remains the question of what credit is due to Sheth on the unliquidated investments, Alien Series I Investments II, LLC, purchased for $500,000, and GreenTech Investments II, LLC, purchased for $50,000. (Crowe Aff. 4.) In its opening brief, the government contended that Sheth is not entitled to any value until those accounts are liquidated. (Gov't Br. 8–9.) Sheth did not argue otherwise in his brief, and the only mention his

brief makes of the accounts is a reference to the government's concession that they will ultimately credit him in the event the accounts are liquidated. (Sheth Br. 5 ("Two (2) additional investments have yet to be liquidated but the government concedes any amount recovered from these investments should be credited to Dr. Sheth.")) The value of these accounts, purchased for $550,000, could be substantial, however, and played a significant role in the Seventh Circuit's remand decision. *Sheth*, 759 F.3d at 718. The court does not consider it waived.

Ascertaining the value of a risky investment, prior to a liquidation event, is difficult. The accounts may have declined in value, but they may also have appreciated. (*See* Crowe Aff. 4.) Unlike the assets discussed above, which have already been liquidated, it is impossible to know the value of these securities. The court concludes that the safest course is to credit Sheth with the full purchase value of these securities until the assets can be liquidated. If the assets are subsequently liquidated, the actual value will be credited to Sheth's restitution judgment. Until that time, Sheth will be credited with the purchase price, $550,000.00.

## VI.    The instant ratification motion

The motion to turn over Sheth's retirement accounts can only be granted if there is a deficiency on the restitution judgment that will be covered by these funds. Sheth was ordered to provide restitution in the amount of $12,376,310.47. The government concedes that he has paid a total of $10,709,309.07. (Burton Decl. at Table A.) With $32,940.53 in accrued interest, the government's position is that Sheth owes $1,699,941.93. (*Id.*)

The court has determined that Sheth is entitled to a $550,000 credit for the unliquidated investments, some credit for the vehicle, and that he may present evidence on the fees paid to Anita and the closing attorney on the Flossmoor home. Even if Sheth received the full value of the car (estimated by the government, at one point, as $5,000 (Pet. of Anita Sheth 11)) and was credited for half the value of the closing attorney's fees and maintenance fees on the Flossmoor home ($8,200), a $1,136,472.00 balance would remain on the judgment. A greater balance would remain if the government is correct that the closing costs and fees paid to Anita were

reasonable. Allowing the government to collect the retirement accounts, liquidated at $300,738.61, does not approach an overcollection on this balance. The government's motion is granted.

## **CONCLUSION**

The government's motions to ratify the turnover orders for the retirement accounts [259, 277] granted. Sheth is granted leave to file a supplemental brief consistent with this opinion.

ENTER:

Dated: January 6, 2017

_____

REBECCA R. PALLMEYER
United States District Judge